UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In re: DIRECTECH SOUTHWEST, INC.,          MDL DOCKET
FAIR LABOR STANDARDS ACT (FLSA)            NO. 08-1984
LITIGATION                                 (Order Ref: ALL CASES)


SECTION "F"


<u>ORDER AND REASONS</u>

Before the Court are the following motions: the defendants'
Motion for Summary Judgment; the defendants' and Motion to Strike
Plaintiffs' Evidence; and the plaintiffs Motion to Strike the
Defendants' Reply. For the following reasons, the Motion for
Summary Judgment is DENIED; the Motion to Strike Plaintiffs'
Evidence is DENIED in part and GRANTED in part; and the Motion to
Strike the Defendants' Reply is DENIED.

**Background**

The plaintiffs in this case represent current and former
technicians or installation and repair technicians who were
employed by DirecTech Southwest, Inc., and paid on a per job basis
after August 10, 2005. As technicians, plaintiffs installed and
repaired DirecTV satellite television hardware into customer
buildings and facilities. This dispute arises out of DirecTech's
alleged failure to pay their technicians overtime for hours worked
in excess of forty per week, in violation of the Fair Labor

1

Standards Act (FLSA). DirecTech, however, classifies these technicians as exempt from the overtime requirements of FLSA. In addition to DirecTech, DirecTech Holding Company, Inc., and DirecTV Inc., are defendants.

DirecTV contracts with certain companies to act as Home Service Providers (HSPs) to be preferred service providers in a select territory for installation, service, and repair of satellite equipment for DirecTV customers. DirechTech is an HSP that employs technicians who are paid different job rates for the different type of service they are assigned to do. The defendants characterize DirecTech's business as providing installation services to DirecTV subscribers, while the plaintiffs underscore that residential customers are DirecTV customers, not DirecTech customers. The defendants claim that DirecTech generates almost all of its revenue from the services provided to residential customers, but the plaintiffs point out that rather than soliciting business from the public, DirecTech fulfills installation orders arising out of sales by DirecTV to the public.

Although admitting that DirechTech receives DirecTV equipment from out of state, the plaintiffs submit that this equipment is kept in inventory at Direchtech warehouses, where it comes to rest before being removed by DirecTech technicians to store on their trucks for installation in the homes of DirecTV customers. The parties seem to agree that the plaintiffs did not drive "commercial

motor vehicle[s]" within the meaning of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), which was enacted on August 10, 2005.

The defendants filed this motion for summary judgment on October 16, 2008. The plaintiffs filed their opposition on September 8, 2009. The defendants filed a motion to strike certain evidence submitted by the plaintiffs with their opposition. On October 14, 2009, the Court granted the defendants' motion for leave to file a reply. The plaintiffs moved to strike the defenses raised in that reply or to strike the entire reply and accompanying exhibits.

As to their motion for summary judgment, the defendants argue that the 2008 Technical Corrections Act (TCA), which amended SAFETEA-LU, applies retroactively such that the "motor carrier" exemption in effect prior to SAFETEA-LU would be treated as having remained in effect. The defendants contend that this motor-carrier exemption applies to exempt the plaintiff technicians from overtime pay requirements. The defendants also urge that Section 306 of the TCA creates a one-year limitation of liability for innocent violations of the SAFETEA-LU, but contend this section of the TCA is inapplicable because of the retroactive effect of the TCA. Further, the defendants argue that this section cannot be applied retroactively because it would impose a new obligation on DirecTech for transactions that have already occurred. However, the

defendants submit that if the Court determines Section 306(b) applies to DirecTech, that it would be entitled to the reprieve of liability for the one-year period following the passage of SAFETEA-LU.

Alternatively, the defendants argue that the plaintiffs are exempt from overtime pay by Section 7(i) of the FLSA as commissioned employees: The defendants contend that the plaintiffs were employed at a service establishment: DirecTech installation services are not resold and satellite television-related customer services are recognized as retail services. Next, the defendants submit that more than one half of the technicians' compensation represents commissions because they are paid based on the service performed, which the defendants contend is based on the amount of service revenue generated for DirecTech. Finally, the defendants assert that the plaintiffs pay exceeded one and one half the minimum wage rate. In support, the defendants submit calculations showing the regular rate of pay assuming certain average work hours.

The plaintiffs respond that the FLSA is remedial and should be construed liberally to protect workers. They admit that the SAFTEA-LU removed the motor carrier exemption for the plaintiff technicians, but they argue that the TCA does not apply retroactively. In support, they rely on the several courts that have considered the issue. They argue that amendments to SAFETEA-LU

4

were rendered retroactive by the TCA, but that Section 305, which restored the prior definition of motor carrier, amended non-SAFETEA-LU provisions of the United States Code. Further, the plaintiffs argue that if Section 305 were applied retroactively, then the safe-harbor provision of Section 306 would be rendered meaningless.

The plaintiffs counter the defendants' alternative argument, insisting that the Section 7(i) commissioned employees exemption cannot apply to the plaintiffs in this case. First, the plaintiffs argue that DirecTech is not a retail or service establishment because the only part of DirecTech that could satisfy "establishment" are its warehouses, but its warehouses cannot qualify as retail establishments because they are not open to the public. Further, the plaintiffs charge that satellite television services are not recognized as retail within the industry and that DirecTech's fulfillment of DirecTV's contract is a "sale for resale," and therefore not retail. The plaintiffs add that the defendants cannot meet the statutory requirement that the plaintiffs were paid more than one and one half times the minimum wage. They argue that defendants calculations are flawed because they are not based on realistic average hours worked.  Further, they charge that the calculations wrongly use the entire employment period, because the minimum wage is measured weekly. Finally, the plaintiffs argue that the defendants cannot show the statutory

requirement that the plaintiffs received wages as commissions. The plaintiffs insist that the technicians were paid based on job rates, but that job rates are not commissions because they are not based on revenues received from the customer; instead, they are based on the type of work done.

### Law and Analysis

#### I.

#### Defendants' Motion to Strike Plaintiffs' Evidence

In their motion to strike, the defendants object to several exhibits and declarations presented by the plaintiffs in opposition to the defendants' motion for summary judgment. They argue that the declarations of plaintiffs' counsel and his staff contain inadmissible hearsay, speculation, innuendo, and legal argument. The defendants submit that several exhibits have not been properly authenticated.

The plaintiffs invoke Federal Rule of Evidence 1006 regarding summaries of voluminous documents. They add that the calculations performed by counsel's staff comply under Rule 611(a). They point out that counsel's declaration concerns his knowledge of the discovery process. Further, the plaintiffs submit that the contested exhibits are self-authenticating and have already been produced to the defendants in discovery.

#### A. *Evidence Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, "The

judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The rules require that

> [a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Id. R. 56(e). Thus, the Court cannot properly consider hearsay evidence or unsworn documents. See Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). "[T]he summary judgment evidence need not be in a 'form that would be admissible at trial,' [but] the party opposing summary judgment must be able to prove the underlying facts." Love v. Nat'l Med. Enters., 230 F.3d 765, 776 (5th Cir. 2000) (quoting Geisserman v. MacDonald, 893 F.2d 787, 793 (5th Cir. 1990)).

It is well-settled that "[t]o be admissible [as summary judgment evidence], documents must be authenticated by and attached to an affidavit that meets the requirements of [Federal Rule of Civil Procedure] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2722, at 59-60 (2d ed. 1983) (footnotes omitted). In some cases, an exhibit may

be self-authenticated by the distinctive characteristics of the evidence in conjunction with circumstances. See id. R. 901(b); see also Garcia v. Texas Dep't of Human Servs., No. 02-122, 2004 WL 1638240, at *5 (July 6, 2004). Additionally, a party may submit charts, summaries, and calculations, of "voluminous writings, recordings, or photographs which cannot conveniently be examined in court," provided that the underlying documents are "made available for examination or copying, or both." Fed. R. Evid. 1006; see Love, 230 F.3d at 776.

## B. Objections

### i. Declarations

The defendants challenge the declaration of Dan Getman, plaintiffs' counsel, arguing that he cannot be a witness and that his declaration is filled with hearsay, argument, and speculation. Further, they submit that he cannot serve as a proper witness to authenticate the exhibits attached to plaintiffs' opposition. The Court agrees that the declaration is permissible as to statements regarding missing discovery. However, a review of this affidavit reveals several inappropriate legal arguments and unsupported factual conclusions. The Court points to paragraph 4 and the statement that "Defendants' system of coercing underreporting of overtime is common in the industry," and the discussion of regulatory requirements in paragraph 3. The factual statements based on Mr. Getman's personal knowledge will be cautiously

8

permitted, but the Court disregards his attempted submission of legal arguments.

The defendants also challenge the declaration and associated calculations of Carolyn Mow and Michael Russo, plaintiffs' counsel's paralegals. They argue that the calculations are not based on personal knowledge, and submit that both lack the proper credentials to conduct mathematical and statistical analysis. The Court agrees with the plaintiffs that these summaries and calculations can be admitted under Federal Rule of Evidence 1006. The underlying documents are voluminous and were produced by the defendants in discovery and were submitted with the plaintiffs' opposition. Further, the declarations explain the methods used in making the calculations. The defendants' objections to the reliability of the underlying data and the methods of calculation used are considered in the Court's determination on the merits as to their believability and will be subject to strict scrutiny, but the exhibits and declarations will not be stricken.[1]

## ii. Exhibits

The defendants challenge exhibits M, P, T, V, W, and AA as lacking proper authentication. The plaintiffs respond that emails in M, V, and AA are self-authenticating because they were produced by the defendants in discovery. The Court is concerned about the

---

[1]The Court notes that counsel's personal involvement and that of staff will be observed with care.

lack of Bates numbers on these emails; also, it is not clear to what discovery request these emails were produced in response. The Court therefore strikes these exhibits, noting that the plaintiffs do not rely on them in their opposition.

Exhibit T is a purported resignation by one of the plaintiffs, and it contains a Bates number. The plaintiffs argue that it is therefore self-authenticating as one of the defendants' corporate records. The Court finds the production of this email in discovery by the defendants is sufficient to authenticate the document, but again notes that the plaintiffs do not rely on this exhibit.

As to exhibit W, the purported pay stub, the plaintiffs claim it is self-authenticating as a business record. Simply bearing the defendants' logo is insufficient to self-authenticate a document presented by the plaintiffs without an affidavit clarifying what it is supposed to be. The Court strikes this exhibit, once again noting that the plaintiffs did not rely on it in their opposition.

Unlike the above exhibits, the plaintiffs rely on exhibit P, the 2008 time study, for creation of the Mow and Russo calculations and in several references in their opposition. In their opposition to the present motion, the plaintiffs explain that exhibit P is the "2008 Time Study that DirecTV uses when it routes the plaintiff technicians to their different jobs for the day." The plaintiffs argue that the Time Study was supplied by the defendants in discovery (it has a Bates number) and point to deposition testimony

where DirecTech's corporate designee referenced the study. However, it is not clear that the study produced here was actually identified by the designee. Nonetheless, because the document was produced by the defendants and is referenced by the designee in his deposition and additionally in the declaration submitted in defendants' reply, the Court determines it is properly authenticated.

Accordingly, the defendants motion to strike is GRANTED in part and DENIED in part.

II.

Plaintiffs' Motion to Strike Defendants' Reply and Exhibits

The plaintiffs argue that the reply should be stricken because it contains impermissible new materials in the form of new exhibits. Plaintiffs claim prejudice. Plaintiffs also contend that the reply should be stricken on a variety of grounds:  it raises a new argument regarding the applicability of the SAFETEA-LU safe-harbor provision; it raises new arguments on subjects that the defendants precluded plaintiffs from inquiring about in discovery; the defendants have allegedly failed to comply with discovery orders that would permit plaintiffs to fully respond to defendants' motion. In the alternative, plaintiffs request permission to file a sur-reply brief.[2]

The defendants point out that they raised the SAFETEA-LU safe

---

[2]Both sides seem ignorant of 28 U.S.C. § 1927.

harbor provision in their original motion, and the plaintiffs were on notice of this issue and had the opportunity to conduct discovery on the issue and had ample opportunity to conduct discovery on the reliability of the duration data, pointing to deposition testimony on this issue. Defendants insist that they fully complied with all discovery orders, and that this issue was not raised prior to plaintiffs filing their opposition to defendants' motion.

Contrary to the plaintiffs' contentions, the Fifth Circuit has recognized that a district court can consider new arguments and evidence raised in a reply, as long as opportunity for a response is given. Vais Arms, Inc. v. Vais, 383 F.3d 287, 292 (5th Cir. 2004); see also Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[O]ur [earlier] holding does not mean that defendants in this case may submit 'new' evidence in their reply without affording plaintiffs an opportunity to respond."). Thus, the Court must first determine whether plaintiffs' accusations bear up.

The defendants reply includes two new affidavits and seventeen exhibits, including new data and calculations supporting their arguments that the plaintiffs earned more than one and one-half times the minimum wage for purposes of the commissioned employees exemption. This is certainly new evidence, and in order for defendants to succeed in meeting the elements of the "commissioned" employees exemption, they would direct the Court to it.

Nonetheless, even considering this evidence, as will be discussed below, there remain issues of material fact as to the minimum wage and commission elements for application of the commissioned employee exemption. Therefore, the Court finds that an opportunity to reply to the new evidence is unnecessary. Summary relief in this case, on this record, is patently improper.

The safe-harbor issue was raised by defendant in a footnote. The Court notes that the defendant's motion more directly stated "Section 306(b) is not applicable on its face to DirecTech or plaintiffs" and focused on its retroactivity argument. Because the plaintiffs did not address the issue of the applicability of the safe-harbor provision in their opposition, when it reasonably seemed a minor alternative argument, the Court ordinarily would not rule on the issue without a response by the plaintiffs, but, as noted, summary relief will not be permitted on this record.

The plaintiffs next challenge the reply because it presents arguments based on the Seibel duration data, which they allege they were denied access to in discovery. The plaintiffs seem to admit that they received some of the underlying time studies, but point out that they were denied more discovery by Magistrate Judge Shushan who determined the information was missing. They add that they were denied the opportunity to depose DirecTV, who conducted the time studies, because the defendants claimed that the time studies were not necessary to resolve the summary judgment motion.

13

The defendants' opposition to this motion points out that the plaintiffs have the underlying data and actually deposed both a DirecTech and a DirecTV witness regarding the reliability of the duration data. The Court finds that discovery has been adequate; further, the new calculations presented are insufficient to resolve the issue of regular rate of pay, thus a reply is unnecessary.

### III.

### Motion for Summary Judgment

#### A. Standard

Rule 56 of the Federal Rules of Civil Procedure instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is

appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

### B. Motor Carrier Act Exemption

Under FLSA, employers must compensate employees who work over forty hours in a given week at a rate of at least one and one-half their regular hourly pay rate. 29 U.S.C. § 207. "The principal congressional purpose . . . was to protect all covered workers from substandard wages and oppressive working hours." Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 739 (1981). The Supreme Court requires exemptions "to be narrowly construed against the employers seeking to assert them and their application [to be] limited to those establishments plainly and unmistakably within

their terms and spirit." <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960). Thus, the employer bears the burden of proving that an exemption applies. <u>See Corning Glass Works v. Brennan</u>, 417 U.S. 188, 197 (1974).

The maximum hour requirements of the FLSA do not apply to "[a]ny employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213 (b)(1). Under the Motor Carrier Act, the Secretary of Transportation can prescribe qualifications and maximum hours of service of "employees of . . . a motor carrier." 49 U.S.C. § 31502(b). Thus, under the MCA exemption, where the definition of "motor carrier" applies, an employee is exempt from the overtime requirements of FLSA. <u>See Barefoot v. Mid-America Dairymen, Inc.</u>, 16 F.3d 1216 (5th Cir. 1994) (per curium). Prior to August 2005, a motor carrier was "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102 (2002) (amended 2005 and restored 2008). On August 10, 2005, Congress enacted the SAFETEA-LU, which changed the definition of motor carrier to "a person providing a commercial motor vehicle." 49 U.S.C. § 13102 (2006) (amended 2008). The associated definition of "commercial motor vehicle," required a vehicle weighing at least 10,001 pounds. <u>Id.</u> § 31132. The parties here all agree that the technicians did not drive vehicles weighing more than 10,000 pounds, and thus under the SAFETEA-LU, the MCA exemption would not

apply. On June 6, 2008, Congress passed the Technical Corrections Act. Pub. L. No. 110-244, 122 Stat. 1573 (codified as amended in scattered sections of U.S.C.). Section 305 of the TCA amended the MCA to remove "commercial" from the definition of motor carrier, thereby restoring the pre-SAFETEA-LU exemption. In Section 306(a), the TCA requires the maximum hour protections of FLSA, 29 U.S.C.§ 207, "shall apply to a covered employee notwithstanding [the Secretary of Transportation exemption] (29 U.S.C. § 213 (b)(1))." Under Section 306(c), a covered employee includes a person employed by a motor carrier "whose work, in whole or in part, is defined– (A) as that of a driver, driver's helper, loader, or mechanic; and (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less." Section 306(b) created a safe harbor, limiting an employer's liability for violation of the FLSA if that violation occurred in the one-year period following August 10, 2005, and was without the employer's actual knowledge that it was subject to the FLSA overtime requirements.

Based on the amendment of the motor carrier definition, the defendants argue that at least as of June 6, 2008, the MCA exemption applies to the plaintiff technicians and any liability of the defendants would cease. The plaintiffs do not address this point. Nonetheless, Section 306(a) of the TCA indicates that the maximum hour protections of the FLSA apply to employees otherwise covered by the MCA. See Brooks v. Halsted Commc'ns, Ltd., 620 F.

17

Supp. 2d 193, 198 (D. Mass. 2009) ("[T]he TCA reconfirmed that the MCA exemption was inapplicable to employees of motor carriers who drove motor vehicles that weighed 10,000 pounds or less."); Glanville v. Dupar, Inc., No. 08-2537, 2009 WL 3255292, at * 4( S.D. Tex. Sept. 25, 2009) (same); Tews v. Renzenberger, Inc., 592 F. Supp. 2d 1331,1346 (D. Kan. 2009) ( "[T]he Technical Corrections Act effectively modified the MCA exemption of the FLSA by affirming that the overtime provisions of the FLSA apply to employees of a motor carrier who, in pertinent part, drive motor vehicles on public highways in interstate commerce so long as those motor vehicles weigh 10,000 pounds or less and transport eight or less passengers."). Further, the defendants seem to admit that the plaintiffs are covered employees in arguing that the safe harbor, which also applies to covered employees, acts to limit their liability if the Court finds the Section 305 amendment is not retroactive. It seems that all plaintiffs in this action terminated their employment prior to the enactment of the TCA, thus the Court need not address the issue of DirecTech's liability after June 6, 2008.

The defendants submit that Section 305 of the TCA applies retroactively because it restores the law prior to SAFETEA-LU and is curative in nature. As the plaintiffs point out, no district court that has addressed this issue has agreed. See, e.g., Benoit v. Tri-Wire Eng'r Solutions, Inc., 612 F. Supp. 2d 84, 87-90 (D.

18

Mass. 2009); <u>Vidinliev v. Carey Int'l, Inc.</u>, 581 F. Supp. 2d 1281, 1289-90 (N.D. Ga. 2008); <u>Hernandez v. Brink's, Inc.</u>, No. 08-20717, 2009 WL 113406, at *7 (S.D. Fla. Jan. 15, 2009); <u>Loyd v. Ace Logistics, LLC</u>, No. 08-188, 2008 Wl 5211022 (W.D. Mo. Dec. 12, 2008); <u>Veliz v. Cintas Corp.</u>, No. 03-1180, 2008 WL 4911238, at *5 (N.D. Cal. Nov. 13, 2008). The Court agrees with the reasoning in these cases.

"The Supreme court has stated repeatedly 'that there is a presumption against retroactive legislation that is deeply rooted in our jurisprudence.'" <u>Margolies v. Deason</u>, 464 F.3d 547, 551 (5th Cir. 2005 (quoting <u>Hughes Aircraft Co. v. United States ex rel. Schumer</u>, 520 U.S. 939, 946 (1997)). Under the two-part test established by the Supreme Court in <u>Landgraf v. USI Film Products</u>, the Court must first "determine whether Congress has expressly prescribed the statute's proper reach." 511 U.S. 244, 280 (1994). "[T]he Court has indicated that an express prescription is synonymous with an 'unambiguous directive.'" <u>Margolies</u>, 464 F.3d at 552 (quoting <u>Lindh v. Murphy</u>, 521 U.S. 320, 325 (1997)).

Here, there is no unambiguous directive. First, Section 121 of the TCA states that the date of enactment is the effective date, except for amendments to SAFETEA-LU. But as the court in <u>Vidinliev</u> held, "a close look at the statute reveals" that Section 305 of the TCA does not amend SAFETEA-LU, it amends the ICC Termination Act and the scope of the MCA. 581 F. Supp. 2d at 1289-90. Second,

"where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). As the plaintiffs point out, Sections 101-113, 120, 201, and 301-304 of the TCA all specifically state that "[SAFETEA-LU] is amended." See Vidinliev, 581 F. Supp. 2d at 1290 (recognizing that "many sections of the [TCA] expressly state that the section is an amendment to SAFETEA-LU").

Finally, "a statue should not be construed in such a way as to render certain provisions superfluous or insignificant." Woodfork v. Marine Cooks & Stewards Union, 642 F.2d 966, 970 (5th Cir. 1981)(quoting Ziegler Coal Co. v. Kleppe, 536 F.2d 398, 406 (D.C. Cir. 1976)). As the court in Vidinliev observed, "[i]f the definition of motor carrier in section 305 applies retroactively, then the one-year defense in section 306 is nothing more than surplusage." 581 F. Supp. 2d at 1291. Indeed, there is no need for a one-year limitation on liability if Section 305 applies such that there is no liability from the date of the enactment of SAFETEA-LU. Accordingly, the Court determines that Section 305 does not apply retroactively to make the restored definition of motor carrier applicable between August 2005 and June 2008.

The Court notes that although the defendants stated in a footnote to their motion that "[t]o the extent the Court determines that 306(b) applies to DirecTech, it would be entitled to the reprieve of liability for the 1-year period following the passing of SAFTEA-LU," the plaintiffs have not had adequate opportunity to respond. Thus, as to the applicability of the one year limitation on liability to the defendants, the Court denies the motion without prejudice to raising the issue again at the proper time.

## C. Commissioned Sales Exemption

Section 7(i) of the FLSA creates an exemption from the maximum-hours regulations for an employee of "a retail or service establishment," if " (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him . . . and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). As described above, the employer bears the burden of proving that an exemption applies. See Corning, 417 U.S. at 197. Thus, in order for this exemption to apply, the defendants must show that (1) DirecTech is a "retail or service establishment;" (2) the plaintiffs regular rate of pay was more than one and one-half times the minimum wage; and (3) more than half the plaintiffs' compensation represented commissions. See Gieg v. DDR, Inc., 407 F.3d 1038, 1048 (9th Cir. 2004). Furthermore, as the plaintiffs point out, the Department of

21

Labor requires that employers claiming the exemption under Section 7(i) must note this on their payroll records and must maintain a written copy or summary of the agreement. 29 C.F.R. § 516.16.

i.   Retail or Service Establishment

For purposes of the exemption from overtime pay requirements, a retail or service establishment "means an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411. Courts employ a two-step process, first determining "whether the sale of a particular type of goods or services can qualify as retail" and if this "retail concept" can apply, determining "the terms or circumstances that make a sale of those goods and services a retail sale." Brennan v. Great Am. Discount & Credit Co., 477 F.2d 292, 295 (5th Cir. 1973) (citing Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 202-03 (1965)). Rather than a "bright line" approach, to determine whether the retail concept exists, the Court should employ a case-by-case approach. See Collins v. Horizon Training Centers, No. 3:02-1310, 2003 WL 22388448, at *5 (N.D. Tex. Sept. 30, 2003).

The plaintiffs argue that DirecTech cannot be a retail or service establishment because the only "distinct physical place of business" are DirecTech's warehouses, which are not open to the general public. However, the regulation cited by the plaintiffs for

22

the "physical place of business" definition deals with a business that has several separate places of business, not an in-home service provider. <u>See</u> 29 C.F.R. § 779.23. Courts have held that businesses that provide on-site computer software training or companies providing in-home carpet cleaning can be retail or service establishments. <u>Reich v. Delcorp., Inc.</u>, 3 F.3d 1181, 1182, 1186 (8th Cir. 1993) (in-home carpet cleaning); <u>Schwind v. EW & Assocs.</u>, 371 F. Supp. 2d 560, 566-67 (S.D.N.Y. 2005) (on-site computer training); <u>see also</u> <u>English v. Ecolab, Inc.</u>, No. 06-5672 , 2008 WL 878456, at *10 (S.D.N.Y. March 31, 2008) (finding a pest-extermination company qualified as an "establishment" although service specialists received calls at their own homes before performing services on site); <u>but see</u> <u>Wirtz v. Keystone Readers Serv. Inc.</u>, 418 F.2d 246, 258 (5th Cir. 1969) ([The door to door salesman's] retailing activities occur solely in the consumer's home, and a prospective customer's home obviously cannot constitute the seller's retail establishment."). Thus, the Court does not find itself limited to DirecTech's physical warehouses in determining whether the retail concept can apply.

A retail or service establishment is one that "meets everyday needs of the local community, stands at the end of a system of distribution and provides services for the comfort and convenience of the general public's daily routine." <u>Collins</u>, 2003 WL 22388448, at *6; <u>see</u> 29 C.F.R. § 779.318(a). It is not determinative that a

third party pays for the services.  See Hodgson v. Prophet Co., 68
Lab. Cas. (CCH) § 32,713, at *4 (W.D. Okla. 1971) ("The matter of
being paid therefor by a third party is deemed immaterial or not of
such significance as to render the sale a resale and not a direct
sale."). For example, in Schwind, a district court in New York held
that where a company provided computer software trainers to its
clients and the trainers "would train the client's employees or the
client's business customers" the company's services were "at the
end of the stream of distribution, demonstrating that the services
were not intended for resale.  371 F. Supp. 2d at 566.

A retail or service establishment must hold itself out as
available to the public. But, this does not require "in personam
access." English, 2008 WL 878456, at *9. Nonetheless, there must be
"either a physical or electronic confrontation or communication
between buyer and seller." Wirtz, 418 F.2d at 257. In English v.
Ecolab, Inc., a district court in New York held that a pest-
extermination company made itself available to the public where
customers had access to the specialists by telephone when in their
homes or cell phones while they were out on service calls. 2008 WL
878456, at *10. The court did not find it determinative that
customer calls were routed through a service center. Id. In Stevens
v. Welcome Wagon International, the district court held that the
home office of a local saleswoman qualified as an establishment
where the saleswoman maintained a telephone listing in the name of

24

the company. 261 F. Supp. 227, 231 (E.D. Pa. 1966).

Before the advent of satellite television, the Department of Labor listed establishments that "may be recognized as retail," including household refrigerator service and repair shops. See 29 C.F.R. § 779.320. As the regulations explain, "[a] refrigerator repair service shop . . . is available and open to the general public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." Id. § 779.319. The regulations also describe establishments where the existence of a retail concept is not readily apparent, including air-conditioning and heating systems contractors, broadcasting companies, telegraph and cable companies, telephone companies, and plumbing contractors. Id. § 779.317. "[T]here is no retail concept in the construction industry," but, "[i]nstallation which is incidental to a retail sale (as distinguished from a construction or reconstruction contract to do a building alteration, or repair job at a contract price for materials and labor required) is considered an exempt activity." Id. § 779.321(c)-(d). Thus,

> the installation for the customer of such goods sold to
> him at retail requires only minor carpentry, plumbing or
> electrical work (as may be the case where ordinary
> plumbing fixtures, or household items such as stoves,
> garbage disposals, attic fans, or window air conditioners
> are being installed or replaced), or where only labor of
> the type required for the usual installation of chain
> link fences around a home or small business establishment
> is involved, will normally be considered as incidental to

> the retail sale of the goods involved (unless, of course, the transaction between the parties is for a construction job at an overall price for the job, involving no retail sale of goods as such).

Id. (citation omitted). The Court notes that this regulation seems to apply to installation where the same business makes the retail sale of the equipment and performs the installation. As to telephone and broadcast companies, the regulation listing companies that lack the "retail concept" cites an Eighth Circuit case in finding a telephone company was not "a retail and service establishment." Id. § 779.317. (citing Schmidt v. Peoples Telephone Union of Maryville, Mo., 138 F.2d 13 (8th Cir. 1943)). In that case, the Eight Circuit determined that telephone switch board operators were not covered as employees of a service establishment, determining that "service establishment" should be interpreted in its narrow sense as applying to businesses like restaurants, hotels, and barber shops, not in a broad sense to include public utilities. Schmidt, 138 F.2d at 15. The circuit court also considered that FLSA elsewhere provided a specific exemption for certain switchboard operators. Id. at 16. It must be noted that the regulations cited are not binding on this Court, and like the Schmidt case, they were promulgated at least thirty-five years ago and do not take into account changes in the size of and technologies in the current retail economy. See English, 2008 WL 878456, at * 8. More recently, the court in Liger v. New Orleans Hornets NBA Ltd. held that a basketball team could not qualify as

26

a retail or service establishment on the basis of its broadcast revenue because the broadcast sales were sold by the team to a network that resold the air time to advertisers or to individual subscribers. 565 F. Supp. 2d 680, 689 (E.D. La. 2008). This decision seems to recognize that sale of a broadcast could be retail in some instances.

Here, DirecTech provides installation and repair services for residential satellite dishes. The Court finds that this industry can have a retail concept. DirecTech's services do not involve the intense structural work that would categorize it as a construction contractor. Although DirecTV sells the satellite dish and the satellite television service, the installation by DirecTech can be viewed as incidental to that sale. Additionally, the Court agrees with the court in Schwind, that the fact that DirecTV solicits and accepts payment from the customers and then pays DirecTech for the installation work DirecTech technicians perform for the satellite customers does not make DirecTech's sale of services a sale for resale. Clearly, the customer for whom DirecTech installs the satellite is the end user. Further, the Court finds that satellite television is a service enjoyed by, or at least available to, the community at large. Thus, not only can the retail concept apply to DirecTech's sale of services, in this case DirecTech qualifies as

a retail or service establishment.[3]

ii.  Rate of Pay in Excess of One and One-Half Times Minimum Wage

Application of the exemption next requires that the plaintiffs rate of pay is more than one and one-half times the minimum wage. The regular rate of pay is the "hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Waling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945). "It is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate." 29 C.F.R. §779.419 (citing Overnight Motor Co. v. Missel, 316 U.S. 572 (1942)). Thus the general rule seems to require that for each workweek in which the employer asserts that the exemption applies and overtime pay is not due, the employee must have earned more than one and half times the minimum wage based on the hours worked and the compensation for that week. See id. Courts have recognized, however, that a calculation dividing the income earned over a year to determine average weekly income may be appropriate, as when a salesman earns

---

[3] The plaintiffs do not challenge the percentage of DirecTech's sales that make up retail services, but challenge the entire categorization of DirecTech's sales. Having determined that the activities challenged by the plaintiffs qualify as retail services, the Court concludes that there is no disagreement that these services make up at least 75% of DirecTech's per annum sales.

more in some weeks and less in others. <u>Walton v United Consumers Club, Inc.</u>, 786 F.2d 303, 307 (7th Cir. 1986); <u>see</u> <u>Triple "AAA" Co. v. Wirtz</u>, 378 F.2d 884, 887 (10th Cir. 1967) (holding that a trial courts' calculation of overtime to be awarded to the plaintiffs by taking the monthly income multiplied by twelve and dividing by fifty-two to determine the regular rate of pay was appropriate).

The parties intensely dispute the calculations used to determine the rate of pay. The defendants present calculations where plaintiffs' yearly pay is divided by the number of weeks worked, and then again divided by an estimated number of hours worked per week. This type of calculation may be appropriate where, as here, the employees are paid different amounts each week.  Even if the technicians averaged 60 hours per week, these calculations show that the one-and-a-half times the minimum wage requirement is easily met.  The defendants submit that 60 hours per week is a generous estimate. But plaintiffs present their declarations that they consistently worked over 60 hours per week, and often more than 70 or 80 hours per week, but were instructed to under-report their hours.   Plaintiffs also present week-by-week calculations of the plaintiffs' rate of pay through the Mow declaration described above. These calculations use the amount actually paid in a week divided by the estimated hours for the jobs performed based on the 2008 time study. These calculations reveal different results for each plaintiff with some plaintiffs showing none or only a few

weeks where their pay dipped under minimum wage, and others where
more than half or almost all weeks were calculated as less than
minimum wage. The defendants object to these calculations because
they are based on a 2008 time study that estimated the average
amount of time for each job. They argue that these estimates are
not reliable because they were made in 2008, after the plaintiffs
had terminated employment. The real dispute seems to be over how
many hours the plaintiffs actually worked in any given week. If
ever a record was flooded with material disputed issues of fact, it
is this record.[4]

### iii.  The Commissions Issue

Even if the plaintiffs' pay is more than one-and-a-half times
the minimum wage, to qualify for the exemption, more than half of
the plaintiffs' compensation for a representative period (not less
than one month) must be based on commissions. The statute does not

---

[4] Based on the Court's review of those plaintiffs who
made declarations estimating their average weekly hours and who
were also given Siebel data work hour estimates in the defendants'
calculations, if the Seibel data is accurate, the plaintiffs' work
estimates are completely inaccurate. In the example most favorable
to the defendants, plaintiff Fuller stated that he worked
consistently over 40 hours and regularly over 60 hours per week.
The Seibel data work hour estimates showed 15 weeks in 42 where
Fuller worked over 40 hours and zero where he worked over fifty.
The example of plaintiff Gibson is more representative of the
others on the list; he stated that he worked consistently over 60
hours per week and regularly 70-80 hours, but the Seibel data
estimates indicate he never worked over 60 hours per week.
Plaintiff Meeks stated that he worked consistently over 60 hours
and regularly over 80. The Seibel data estimates one week when he
worked over 60 hours.

define "commission" and there is little case law in the Fifth
Circuit on the issue. Nonetheless, the reasoning of other courts is
instructive.  A commission "provides workers with an incentive to
work quickly." Klinedinst v. Swift Investments, Inc., 260 F.3d
1251, 1256 (11th Cir. 2001). Of course, the commission rate must be
"bona fide" and not be an attempt to call earnings commissions
simply to avoid overtime pay requirements. See Lee v. Ethan Allen
Retail, Inc., No. 07-108, 2009 WL 2355900, at * 4 (N.D. Ga. July
28, 2009); see also Erichs v. Venator Group, Inc., 128 F. Supp. 2d
1255, 1260 (N.D. Cal. 2001) ("By using the term 'bona fide'
commission rate, Congress apparently envisions a smell test . . .
."). One court has helpfully written:

> For purposes of the FLSA, payment to an employee is a
> commission if it is based on a percentage of the charge
> to the customer. In a "piece work" system, on the other
> hand, an employee is paid a certain amount per task
> regardless of the amount charged to the customer.

Cantu-Thacker v. Rover Oaks, Inc., No. 08-2109, 2009 WL 1883967, at
* 4 (S.D. Tex. June 30, 2009) (citing Huntley v. Bonner's Inc., No.
02-1004, 2003 WL 24133000, at *2-3 (W.D. Wash. Aug. 14, 2003)).

Similarly, in Klinedinst v. Swift Investments, Inc., the
Eleventh Circuit held that the auto mechanics were paid a
commission where customers were charged for a "flat rate" preset
number of hours, while the mechanics were paid based on the flat
rate hours, regardless of how long they actually took to complete

31

a job. 260 F.3d at 1256. Similarly, in <u>Yi v. Sterling Collision Centers, Inc.</u>, the Seventh Circuit held that auto mechanics who were paid by the job were paid commissions, observing that:

> You can spend 40 hours a week making quilts, and be paid by the quilt, and you won't be in the position of having to work overtime one week in order to make up slack time in the previous week. But if you're paid by the sale, you can't count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable; in the present case sales depend on the flow of wounded cars into each of [the defendant's] local repair shops.

480 F.3d 505, 510 (7th Cir. 2007). In contrast, the Western District of Washington in <u>Huntley v. Bonner's, Inc.</u> held that a flat rate payment system was not commission where different customers were charged different hourly rates, but this did not change the amount paid to the employee. 2003 WL 24133000, at * 3.

Thus, a flat rate payment can be a commission as long as "some amount of proportionality . . . exist[s] between flat rates earned by workers and the prices paid by customers for the products sold." <u>Parker v. Nutrisystem</u>, No. 08-1508, 2009 WL 2358623, at *8 (E.D. Pa. July 30, 2009). For example, in <u>Parker v. Nutrisystem</u>, the court determined that some proportionality existed in a payment system where telephone-call-center employees were compensated based on the number of 28-day meal plans sold. However, the rate of compensation compared to customer cost did not yield a fixed ratio because while the charge to customers remained the same at

different times of the day, the employees per meal compensation was
higher for sales made during evening and weekend hours. Id. at *2.
In holding that the employees were paid commissions, the Court
found persuasive that the employees worked in sales such that the
amount earned "depends in large part on the preferences of
customers and on the ability of the employees to persuade those
customers to buy what is being offered for sale." Id. at *9. The
court contrasted piece-work payment systems, noting that under the
Nutrisystem payment schedule  it was "not solely the efforts of
workers to produce a product or complete an assignment without
regard to the sale that determine[d] how much money they make." Id.

    In the present case, the defendants contend plaintiffs were
paid a commission because they were paid by the job or service
performed, not by the hours worked, so that by working faster and
completing more jobs, the plaintiffs could earn more pay. The
plaintiffs respond that they were not paid a commission because
they were paid the same for  jobs regardless of how much the
customer pays. Paragraph 10 of the McNeel affidavit presented by
the defendants in their motion indicates that "DirecTech assigns a
monetary rate tied directly to the overall value of each type of
service performed." Yet, in apparent contrast, plaintiffs
opposition highlights deposition testimony by a DirecTech
representative to the effect that the job rate is not calculated as
a percentage of the payment received by DirecTech from DirecTV.  To

33

support the Mow declaration, the plaintiffs present some calculations showing the ratio of job-rate pay to the DirecTV payment rate, which shows a ratio variation of between 13% and 75%. This shows that, for example, a service coded SP earns the employee $30 and earns DirecTech $125, but a service coded R3 earns DirecTech $120 and earns the employee $60. It also shows that services that the technician might sell on site--custom services-- have a consistent 75% ratio of employee pay to customer charge. The list presented by DirecTech does not include percentages but reveals a similar trend. Using the defendant's numbers, the Court calculates the ratio between employee pay and DirecTech revenue to range from 14% to 46%. Based on the evidence submitted by the parties, it is simply not clear how DirecTech determines what to pay the employees. The Court cannot conclude that employee pay is determined by the value of the service to DirecTech.

Further, unlike the employees in <u>Nutrisystem</u>, where the proportionality between pay and value was existent but not clear, the employees here are not primarily engaged in sales. DirecTech submits that technicians interact with customers on site and may sell them additional services for additional compensation to the technician. This scenario seems a clearer example of commission-based pay. But DirecTech does not present evidence to show what percentage of the employee's total pay is made up by this type of commission.

Here, the proportionality between the rate earned by Directech and the rate earned by the plaintiffs for each job is not clear. And while the defendants have pointed out that plaintiffs can modify services on site, there is no evidence that these modifications make up more than 50% of the plaintiffs's income. On the evidence presented, the Court cannot conclude that the technicians here were paid more than 50% in bona fide commission.[5] In sum, a submission for summary judgment is, at most, wishful thinking.

## IV. Conclusion

Accordingly, the defendants Motion for Summary Judgment is DENIED; the Motion to Strike Plaintiffs' Evidence is DENIED in part and GRANTED in part to strike plaintiffs' exhibits M, V, W, and AA; and the Motion to Strike the Defendants' Reply is DENIED.

New Orleans, Louisiana, November 18, 2009.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[5]The Court notes that there is no evidence that the defendants complied with the Department of Labor regulations requiring the employer seeking to claim the commissioned employee exemption to maintain a written copy or summary of the commission agreement and to note commissions on the payroll records. See 29 C.F.R. § 516.16.